UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> v. ) <br> ) <br> ) <br> ) <br> ) <br> BARRY J. GOODMAN, ) <br> ) <br> Defendant. ) <br> ) <br> ) | **05 CR 10038 DPW** <br> CRIMINAL NO. <br><br> VIOLATIONS: <br><br> 15 U.S.C. §80b-6 & 80b-17 (Investment Adviser Fraud) <br> 15 U.S.C. § 78j(b) & 78ff (Securities Fraud) <br> 18 U.S.C. § 1343 (Wire Fraud) <br> 18 U.S.C. § 2 (Principal) <br> 18 U.S.C. § 981 and 28 U.S.C. § 2461(c) (Forfeiture) |

## INDICTMENT

The Grand Jury charges that:

1. At all times material to this Indictment, Defendant Barry J. Goodman ("GOODMAN") was an individual who resided in Massachusetts.

2. At all times material to this Indictment, GOODMAN operated an investment advisory business, New England Capital Advisory Group, LLC ("New England Capital"), in Massachusetts.

### THE SCHEME TO DEFRAUD

#### Overview

3. Between February and August 2000, GOODMAN obtained and then misappropriated $700,000 through two fraudulent investment schemes offered through New England Capital.

4. The first scheme involved a fictitious "initial public offering pool" (the "IPO Pool"). GOODMAN collected $500,000 from two investors after falsely representing that he

would use their funds to obtain stock in initial public offerings underwritten by five investment banks during a specified period. GOODMAN falsely claimed that his firm would open accounts at each of the five investment banks and that because of his special relationship with each investment bank, the accounts would receive allotments of shares in the IPOs the banks underwrote. GOODMAN told the investors that he would be able to sell the IPO shares immediately at a profit, with minimal risk. In fact, neither GOODMAN nor his firm established any such accounts with the investment banks, and when he received the funds from the investors, he did not invest the funds in IPOs. Instead, he used the funds to engage in day trading, to pay other clients, and to pay himself.

5. The second scheme involved a false "arbitrage" opportunity in the internet company, Lycos, Inc. ("Lycos"). In that scheme, GOODMAN falsely represented to one of the IPO Pool investors that he had created an investment strategy in which New England Capital would buy stock in Lycos and use options to minimize the risk that Lycos stock would decline in value. GOODMAN collected an additional $200,000 from that investor. GOODMAN, however, did not invest the money as he represented. He had no "arbitrage" strategy. He did not buy Lycos stock with the investor's $200,000. Instead, as he had done with the IPO Pool funds, he used the funds to pay other clients and to pay himself.

### GOODMAN Forms New England Capital

6. In May 1999, GOODMAN and an acquaintance formed New England Capital (which from its formation until November 1999 was known as Bogey Capital LLC). GOODMAN held himself out as an investment adviser managing client funds for a fee through New England Capital. In June 1999, New England Capital became a member of Valhalla

Partners, LLC ("Valhalla"), a registered broker-dealer that allowed members to trade in proprietary accounts. GOODMAN first worked out of an office in Boston, Massachusetts and then in early 2000 moved to an office in Beverly, Massachusetts.

### The IPO Pool

7.  Beginning in or about February 2000, GOODMAN defrauded two investors of $500,000 by falsely representing that he would invest funds in an IPO Pool. GOODMAN described the IPO Pool in a telephone call to one of his clients, AG, in late February 2000. GOODMAN told AG that he was raising an IPO Pool of $2.5 million at New England Capital. GOODMAN told AG that GOODMAN had made arrangements with five investment banks pursuant to which he would place $500,000 in an account at each firm. GOODMAN further stated that each firm would then allot shares in the IPOs it underwrote for the next three months to the New England Capital accounts at the firm. GOODMAN stated that, because New England Capital could immediately resell the shares, there would be little downside risk. GOODMAN stated that he was reserving $2 million of the $2.5 million pool for his current clients, but would make the remaining $500,000 opportunity available to friends and family of AG.

8.  GOODMAN's representations regarding the IPO Pool were false. GOODMAN made no arrangement to obtain IPO shares with any of the investment banks at which he represented that IPO Pool funds would be invested. Neither GOODMAN nor New England Capital maintained any account at any of the investment banks.

**A. G-Net Group, Ltd.**

9.   In late February 2000, AG told an acquaintance, AK, about the IPO Pool. AK was director of G-Net Group, Ltd. ("G-Net"), a company set up to make investments for a family with which AK was acquainted.

10.   AK then spoke directly with GOODMAN via teleconference. During the teleconference, GOODMAN told AK that he provided investment advisory services to high net worth individuals through New England Capital. GOODMAN falsely stated that he ran a hedge fund and managed approximately $70 million. GOODMAN then represented to AK that he was creating a $2.5 million IPO Pool, and was making $500,000 available to friends of AG. GOODMAN again falsely stated that he had made arrangements with five investment banks pursuant to which he would place $500,000 in a New England Capital account at each firm. GOODMAN falsely stated that each firm would then sell shares in each IPO it underwrote for the next ninety days to New England Capital. GOODMAN also told AK that by participating in the "syndicate," AK would obtain a greater allocation of IPO shares than if he attempted to purchase the shares independently. GOODMAN also represented that, once purchased, the shares could be immediately be resold for a profit. GOODMAN also represented that investor funds would be pooled and each investor would receive back his principal investment plus a pro rata share of the pool profits less a fee.

11.   On or about February 28, 2000, GOODMAN faxed from Massachusetts two letters to AK in Virginia. The first letter stated, among other things, that "for the next several months, I [GOODMAN] will be investing in the I.P.O. market and have given this oppurtunity[sic] to investors . . ." The second letter described the fees for the investment

opportunity, the expected length of the investment, and how the funds would be returned to investors at the plan's conclusion. After receiving the letters, AK requested that GOODMAN provide a more complete description of the investment plan. GOODMAN then asked AK to prepare an agreement outlining the IPO Pool plan that would be acceptable to AK.

12. On or about February 29, 2000, AK faxed from Virginia to GOODMAN in Massachusetts a letter setting forth the IPO Pool as AK had understood GOODMAN to be proposing. Specifically, the letter stated, among other things:

- that New England Capital had "formed relationships with five Securities firms such as Goldman Sachs, JP Morgan, etc. to act as a Syndicate in upcoming IPO investments over the next 90 days";

- that New England Capital would "open accounts in each of the five respective firms for $500,000 each";

- and that at the end of the 90-day investment period, New England would arrange to have the investor funds transferred back, within 30 days of receiving a request for the return;

- that it was "the intention of New England Capital Advisory Group to invest all the assets in Initial Public Offerings [as described in the letter]."

As a precondition to investing G-Net's money with GOODMAN, AK required GOODMAN to sign and return the letter, indicating his acceptance of each of the representations in the letter. That same day, GOODMAN signed the letter and returned it to AK via facsimile from Massachusetts to Virginia. In fact, GOODMAN knew, when he signed the letter and returned it by facsimile to AK, that New England Capital had not created relationships with any investment banks or any other financial institutions for the purpose of receiving IPO share allocations, and GOODMAN had no intention of fulfilling the promises set forth in the letter.

5

13.     After returning the letter, GOODMAN spoke to AK by phone and requested that AK wire G-Net's investment to New England Capital's account quickly so as to participate in the an IPO allotment that one of the supposed IPO Pool accounts had received. On or about March 3, 2000, AK, in reliance on the false and misleading statements and promises made by GOODMAN orally and in the February 29, 2000 letter, wired $250,000 from a G-Net account in Virginia to the New England Capital bank account in Massachusetts to be invested in the IPO Pool.

### B. Investor SA

14.     AG also told a friend, SA, about GOODMAN's IPO Pool. During a breakfast meeting with SA on about February 28, 2000, AG's repeated GOODMAN's proposal to SA. SA made a $250,000 investment in the IPO Pool shortly thereafter. SA provided the money to GOODMAN in two installments: (a) a $50,000 wire from an account at CIBC World Markets in New York to New England Capital's account at Atlantic Bank in Massachusetts; and (b) a $200,000 wire from the Standard Chartered Bank in Dubai, UAE to New England Capital's Atlantic Bank account.

### C. GOODMAN Misappropriates the IPO Pool Funds

15.     GOODMAN did not use the G-Net and SA funds to purchase stock in IPOs. Contrary to GOODMAN's representations, none of the $500,000 that the investors sent to New England Capital for investment in the IPO Pool was ever placed in an account at the investment banks GOODMAN had identified. Instead, within a few days after the $500,000 in funds from G-Net. and SA arrived in the New England Capital bank account, GOODMAN caused a total of $120,000, more or less to be transferred from the account to two other clients. GOODMAN also

transferred $34,000, more or less to his own personal bank account, and $340,000, more or less to the New England Capital day trading account at Valhalla.

16.     Thereafter, GOODMAN transferred some of the funds in the Valhalla account back to the New England Capital account, from which he made additional payments totaling, $160,000, more or less to other clients. He also made additional transfers totaling $18,300, more or less to his own bank account. GOODMAN lost most of the remaining funds day trading in the Valhalla account.

17.     GOODMAN never disclosed to AK or SA that their funds would be used for his personal benefit and the benefit of third parties. Indeed, from in or about March through in or about June, 2000, GOODMAN in telephone calls falsely represented to AG, who in turn told SA and AK, that the funds had been invested in particular IPOs and had been in most instances sold at a profit. GOODMAN falsely represented in conversations during this time period that the IPO Pool had obtained shares in a variety of IPOs. GOODMAN also made similar false statements from in or about March through in or about June 2000 to AK directly.

18.     In fact, GOODMAN did not use the investor funds he transferred to Valhalla to invest in IPOs in any of the companies in which he represented he had purchased IPO shares.

### The Lycos Investment

19.     During a telephone call in early August 2000, GOODMAN informed AG that he had an arbitrage opportunity to invest in stock of Lycos. After GOODMAN told him about the Lycos investment opportunity, AG telephoned AK to inform him of GOODMAN's call.

20.     On or about August 14, 2000, AK telephoned GOODMAN. On that call, GOODMAN stated that Lycos was going to be purchased by Terra Networks, Inc. and that the

price of Lycos would likely rise significantly. GOODMAN further represented that New England Capital had purchased "protective" positions in options so that the "downside" risk was limited to two points. GOODMAN stated that he had a special relationship with an investment bank allowing him to obtain "two to one leverage" in the stock. On or about August 15, 2000, GOODMAN sent AK a letter via facsimile from Massachusetts to Virginia. In that letter GOODMAN confirmed the representations he had made to AK, including the representation that New England Capital had purchased "protective" options.

21.  On or about August 17, 2000, AK wired $200,000 from a G-Net account to New England Capital's Atlantic Bank account to be used to purchase Lycos stock and participate in the arbitrage opportunity described by GOODMAN.

22.  GOODMAN's representations regarding the Lycos investment were false. Neither he (nor his firm) purchased Lycos stock or the "protective options" he described to AK. Moreover, GOODMAN never used the G-Net funds to buy Lycos stock. GOODMAN had no intention of using G-Net's money to make an investment in Lycos stock. Instead, he used the money that AK gave him for his own personal benefit and to make payments to other clients.

### GOODMAN's Continuing Fraud

23.  In or about late August and early September 2000, GOODMAN, in response to AK's requests for the IPO Pool funds, lied and falsely told AK and AG that the funds from the IPO Pool were not available because the accountants had not completed the audit of the funds. Later, in or about September and October 2000, GOODMAN again lied to AK and AG and falsely assured them that GOODMAN would wire the G-Net funds within a few days.

24. In or about mid-October, 2000, GOODMAN met with AG and AK. At the meeting, GOODMAN lied to both individuals, falsely telling them that GOODMAN had invested G-Net's IPO Pool principal and profits in Lycos stock, which had then fallen sharply. GOODMAN claimed that he would nevertheless be able to wire funds to repay G-Net the following day.

25. On or about October 26, 2000, GOODMAN sent AK a letter by facsimile from Massachusetts to Virginia proposing a payment plan for the return of the G-Net Lycos investment money and the "principal from the ipo investment plus your profit of $117,000 dollars totaling $367,000 dollars." The letter stated that payment would be made by November 5, 2000. AK rejected this proposal and demanded an immediate return of G-Net's funds and the profits from the IPO investment. On about October 27, 2000, GOODMAN telephoned AK and falsely represented that he had wired the funds to AK.

26. As of the date of this Indictment, the defendant BARRY J. GOODMAN has not repaid any of the monies entrusted to him by either G-Net or SA.

## COUNTS ONE THROUGH THREE
### Willful Violation Of The Investment Adviser's Act of 1940
### 15 U.S.C. §§ 80b-6 & 80b-17

27.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-26 of this Indictment and further charges that:

28.     At various dates in the District of Massachusetts and elsewhere, BARRY J. GOODMAN, defendant herein, being an investment adviser did, by use of means and instrumentalities of interstate commerce, willfully employ devices, schemes, and artifices to defraud; did willfully engage in transactions, practices, and courses of business which operated as a fraud or deceit upon clients and prospective clients; and, did willfully engage in acts, practices, and courses of business which were fraudulent, deceptive, and manipulative, to wit, falsely representing that he would serve as an investment adviser exercising fiduciary responsibility with respect to client funds entrusted to him and thereafter misapplying and misappropriating client funds, specifically the following investments:

| COUNT | DATE | INVESTMENT |
| --- | --- | --- |
| 1. | March 3, 2000 | G-Net $250,000 investment in the IPO Pool. |
| 2. | August 17, 2000 | G-Net $200,000 investment in Lycos. |
| 3. | February 28 & 29, 2000 | SA $250,000 investment in the IPO Pool. |

All in violation of Titles 15 U.S.C. §§ 80b-6 & 80b-17 and Title 18 U.S.C. § 2.

## COUNTS FOUR THROUGH SIX
### Securities Fraud
### 15 U.S.C. §§ 78j(b) & 78ff

29. The Grand Jury re-alleges and incorporates by reference paragraphs 1-26 of this Indictment and further charges that:

30. At various dates in the District of Massachusetts and elsewhere, BARRY J. GOODMAN, defendant herein, did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, directly or indirectly (a) employed a device, scheme and artifice to defraud, (b) made untrue statements of a material fact and omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, and (c) engaged in acts, practices and courses of business which operated as a fraud and deceit upon persons, in connection with the purchase and sale of securities, including following payments made for purchase of securities on or about the dates set forth below:

| COUNT | DATE | PURCHASE OF SECURITIES |
|---|---|---|
| 4. | March 3, 2000 | G-Net payment of $250,000 for IPO Pool. |
| 5. | August 17, 2000 | G-Net $200,000 payment for Lycos. |
| 6. | February 28, 2000 and February 29, 2000 | SA $250,000 payments for IPO Pool. |

All in violation of Titles 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5 and Title 18 U.S.C. § 2.

## COUNTS SEVEN THROUGH ELEVEN
## Wire Fraud
## 18 U.S.C. § 1343

31.  The Grand Jury re-alleges and incorporates by reference paragraphs 1-26 of this Indictment and further charges that:

32.  On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant BARRY G. GOODMAN having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises concerning material facts and matters, for the purpose of executing and attempting to do so, did take and receive matters and things sent and delivered via interstate wire communications, such matters and things, as follows:

| COUNT | DATE | WIRE COMMUNICATION |
|---|---|---|
| 7. | February 28, 2000 | GOODMAN facsimile from Boston, Massachusetts to AK in Virginia of letter regarding IPO Pool. |
| 8. | February 28, 2000 | GOODMAN facsimile from Boston, Massachusetts to AK in Virginia regarding IPO Pool. |
| 9. | February 29, 2000 | GOODMAN facsimile from Boston, Massachusetts to AK in Virginia regarding to IPO Pool. |
| 10. | August 15, 2000 | GOODMAN facsimile from Boston, Massachusetts to AK in Virginia of letter regarding Lycos investment. |
| 11. | October 26, 2000 | GOODMAN facsimile from Massachusetts to AK in Virginia regarding IPO Pool and Lycos investment. |

All in violation of Titles18 U.S.C. §§ 1343 and 2.

## FORFEITURE ALLEGATIONS

## (18 U.S.C. § 981 and 28 U.S.C. § 2461(c))

THE GRAND JURY FURTHER CHARGES:

33. As a result of the offenses in violation of 18 U.S.C. §§ 1343 and 15 U.S.C. § 78ff charged in Counts Four through Eleven of this Indictment, the defendant, BARRY J. GOODMAN shall forfeit to the United States any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of the offenses, including but not limited to approximately $700,000 paid to New England Capital by G-Net and SA.

34. If any forfeitable property, as described in paragraph 33 above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), incorporated by 28 U.S.C. § 2461(c)), to seek forfeiture of any other property of the defendant up to the value of the property described in paragraph 33 above.

All in violation of Title 18 U.S.C. § 981(a)(1)(c)) and Title 28 U.S.C. § 2461(c)).

A TRUE BILL

_____  2/17/05
FOREPERSON OF THE GRAND JURY

_____
Assistant United States Attorney
DISTRICT OF MASSACHUSETTS February 17, 2005
Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK   2/17/05
@ 12:30pm

# Criminal Case Cover Sheet 05 CR 10038 DPW U.S. District Court - District of Massachusetts

**Place of Offense:** Massachusetts   **Category No.** II   **Investigating Agency** FBI

**City** Boston/Beverly   **Related Case Information:**

**County** Suffolk/Essex

Superseding Ind./ Inf.  N/A           Case No.  N/A
Same Defendant  N/A           New Defendant  N/A
Magistrate Judge Case Number  N/A
Search Warrant Case Number  N/A
R 20/R 40 from District of

## Defendant Information:

**Defendant Name** Barry J. Goodman                    Juvenile  ☐ Yes  ☒ No

**Alias Name**

**Address** 31 Upland Street, North Andover MA 01845

**Birth date (Year only):** 1963   **SSN (last 4 #):** 3157   **Sex** M   **Race:** Caucasian   **Nationality:** USA

**Defense Counsel if known:**                             **Address:**

**Bar Number:**

## U.S. Attorney Information:

**AUSA** Jack W. Pirozzolo                **Bar Number if applicable** 564879

**Interpreter:**  ☐ Yes  ☒ No    **List language and/or dialect:**

**Matter to be SEALED:**  ☐ Yes  ☒ No

☐ Warrant Requested       ☒ Regular Process       ☐ In Custody

## Location Status:

**Arrest Date:**

☐ Already in Federal Custody as _____ in _____
☐ Already in State Custody _____   ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release: Ordered by _____ on _____

**Charging Document:**   ☐ Complaint   ☐ Information   ☒ Indictment

**Total # of Counts:**   ☐ Petty   ☐ Misdemeanor   ☒ Felony  11

Continue on Page 2 for Entry of U.S.C. Citations

☒   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

**Date:** 2/17/05       **Signature of AUSA:**

District Court Case Number (To be filled in by deputy clerk): _____

Name of Defendant    Barry Goodman

## U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 15 U.S.C. §§ 80b-6, b-17 | Investment Adviser Fraud | 1-3 |
| Set 2 | 15 U.S.C. § 78j(b), 78ff | Securities Fraud | 4-6 |
| Set 3 | 18 U.S.C. § 1343 | Wire Fraud | 7-11 |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

ADDITIONAL INFORMATION:  Forfeiture Allegation, 18 U.S.C. § 981 & 28 U.S.C. § 2461